Gregory R. LARIMORE *v.* STATE of Arkansas

CR 91-144                                        833 S.W.2d 358

Supreme Court of Arkansas
Opinion delivered May 26, 1992
[Rehearing denied July 13, 1992.]

*Dan Ritchey* and *Bill Bristow*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. Shortly before noon on January 11, 1990, the body of June Larimore was found on a bedroom floor of her Blytheville home. She had been stabbed 134 times, appar-

ently with a knife that had been wiped clean and replaced in a cutlery block in the kitchen. The body was nude except for panties rolled down around the hips. Body temperature rectally was 91.2 degrees at 12:10 p.m. There was no visible sign of entry nor any evidence of robbery. Ms. Larimore's jewelry was undisturbed and her open purse, containing cash, was by a living room couch where she had left it.

Gregory Larimore, June Larimore's husband of one year, arrived for work at a family business at about 6:45 a.m. and worked routinely throughout the morning, showing no signs of stress or emotional upset. When contacted by the Blytheville police he said that he and June had come home from a wake between nine and ten the previous evening. He fell asleep on the couch watching television and got up at 6:00 a.m. to go to work. When he left his wife was asleep on the bed clad only in a pair of panties. Larimore told another officer he fell asleep on the couch but woke up at 3:00 a.m. and got in bed with his wife where he slept until morning.

Gregory Larimore was charged and convicted of first degree murder and sentenced to life imprisonment.

No motive was established for the murder of June Larimore. The state's case was wholly circumstantial, structured on the theory that she was murdered between 2:00 and 4:00 a.m. and, hence, was not alive when Larimore left for work at 6:30 a.m. Thus, the time of death was a crucial element in the case.

Dr. Fahmy Malak performed the autopsy and postmortem studies on the body of June Larimore. He testified that the pancreas, spleen, kidneys, heart, brain and blood vessels were empty, or "blanched," from a total loss of blood. He said, "It is a known fact that when a body is exposed to numerous stabbings, the body will generate heat." Using a ratio of one degree of temperature loss per hour, Dr. Malak estimated a lapse of 8.4 hours from death to discovery, adding: "But to consider this one point would not be accurate. We have to consider all of the findings — presence of the rigid body, the examination of the body inside — the degree of pathology — the degree of decay inside. In my opinion, she died at least ten to twelve hours before she was found."

The defense presented the testimony of three experts in forensic pathology — Dr. Frank Cleveland, Dr. Don Vollman and Dr. Werner Spitz, all of whom took exception to Dr. Malak's opinion that body heat rises with massive bleeding from stab wounds. Dr. Cleveland estimated five hours as the outside limit with regard to the time of death, Dr. Vollman, four to five hours. Dr. Spitz estimated death as having occurred after 7:00 a.m.

On appeal, Larimore asserts five points of error: I. The circuit judge erred in denying defendant's motion for directed verdict of acquittal; II. The circuit judge erred in denying defendant's motion for a new trial; III. Defendant will be denied due process of law if no relief is granted for the prejudicial exposure of extraneous matter to the jury; IV. The circuit judge erred in allowing the evidence regarding luminol testing to be presented to the jury; V. The circuit court erred in allowing the introduction of extraordinarily gruesome and inflammatory photographs and video tapes. For reasons to be seen, we hold that a new trial should have been ordered and, therefore, we reverse and remand.

I

*The Circuit Judge Erred in Denying Defendant's*
*Motion for Directed Verdict of Acquittal*

Appellant moved for a directed verdict of acquittal and challenges the trial court's denial thereof on the premise that evidence which is contrary to the daily experience of common life and inconsistent with well known physical laws will not sustain a verdict. *Alldread* v. *Mills*, 211 Ark. 99, 199 S.W.2d 571 (1947); *St. Louis S.W. Railway Co.* v. *Ellenwood*, 123 Ark. 428, 185 S.W.2d 770 (1916); 5A C.J.S. *Appeal and Error* § 1649, at 365-366 (1958); 5 Am. Jur. 2d *Appeal and Error* § 827, at 268-269 (1962). We disagree, not with the legal principle stated, but with its applicability to the case before us.

In neither of the cases cited by appellant did this court sustain the argument that pertinent physical laws were so irrefutable it could be said that reasonable minds could entertain no other conclusion, so that the issue could be taken from the jury. In *Alldread* we wrote:

Only in those *extraordinary* cases where deductions from

physical laws and facts so clearly and irrefutably disprove the testimony of witnesses that reasonable minds may not entertain any other conclusion are courts justified in ruling sworn testimony inherently unbelievable and impossible. [Emphasis added.]

■ Dr. Malak's opinion that temperature increases when the body is drained of blood from multiple stab wounds may seem implausible to some, even against the decided weight of medical opinion, but we cannot say that it is so clearly and irrefutably contrary to the laws of nature as to be inherently impossible. Dr. Malak did not state, so far as we can determine, the degree of increased temperature, or its duration. Nor, for that matter, did he indicate that his opinion (that death occurred at a much earlier hour than advanced by the opposing experts) was dependent on the assumption the victim's bodily temperature first increased before it began to wane. It was, he said, simply one of many factors to be considered. The fact that three experts called by the appellant held opposing views on that issue tells us little or nothing as to the certitude of the premise.

We think the trial court was right to reject the motion for a directed verdict of acquittal.

## II

### *The Circuit Judge Erred in Denying Defendant's Motion for a New Trial*

At a pretrial suppression hearing a number of proffered exhibits were held to be inadmissible. Nevertheless, through inadvertence or mistake, the excluded materials and the admitted exhibits were intermingled and submitted en mass to the jury for perusal during deliberations. These materials included segments of a report of luminol testing performed throughout the Larimore home some two months after the homicide; a letter from June Larimore to Greg Larimore, referred to as "The Christmas Letter;" correspondence between defense counsel and the trial judge relative to the luminol testing; proposed exhibits involving an FBI psychological profile of the killer, which was intended, according to appellant, to show that the Blytheville police had furnished false information concerning Greg Larimore to the Bureau. These materials could have fostered the inference that

Larimore's arrival at work was earlier than usual, that he may have used cocaine, that he spoke to the investigators only momentarily before requesting an attorney and exercising his *Miranda* rights, that the Larimores may have had some disagreement on the previous evening when they left the home of friends.

The insinuation of the excluded materials into the jury room came to light when two jurors, not otherwise identified, called the prosecutor and defense counsel within hours after the verdict, asking about information contained in the "exhibits" but not mentioned during the trial. The two jurors made reference to the Christmas letter, the use of drugs and the fact that the Larimores may have been having disagreements over drug use.

Both attorneys promptly and properly reported these conversations to the trial judge and a hearing was held on a Monday following the verdict on Friday. No testimony was taken at the hearing, but the hearing resulted in an order finding that the excluded materials were interspersed with the admitted materials, were placed in the jury room, by carelessness rather than intent, and that the materials were reviewed by the jurors during their deliberations. However, the trial court concluded that the time of death was the sole issue of fact presented by the evidence and since the extraneous materials were not relevant to that issue, they could not have affected the jury's deliberation.

Having reflected on the matter, and for reasons to be explained, we conclude that where no motive was educed, no direct proof of guilt established and such circumstantial proof of guilt as did exist was in sharp dispute, a verdict tainted by the introduction of a mass of materials into the jury room which should not have been there must be set aside. Given the circumstances in their entirety, we are persuaded that a new trial is preferable to a trial encumbered by doubt and should have been ordered.

While we no longer presume error, *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984), *cert. denied*, 470 U.S. 1085 (1985), we have held, consistent with what we believe to be the prevailing view, that where the jury's verdict is tainted by information which came before it improperly, a new trial will be warranted if there is "a reasonable possibility of resulting prejudice." *Borden* v. *St. Louis S.W. Ry. Co.*, 287 Ark. 316, 698

S.W.2d 795 (1985). More recently in *St. Louis S.W. Ry.* v. *White*, 302 Ark. 193, 788 S.W.2d 483 (1990), we said:

> When a new trial is requested because of juror misconduct, pursuant to ARCP Rule 59(a), the moving party must show that his rights have been materially affected. This means the moving party has the burden of proving that a reasonable possibility of prejudice has resulted from the misconduct. *Borden* v. *St. Louis Southwestern Ry. Co., supra.* The vast majority of courts agree that prejudice is not presumed in such situations. *See* Annot., 11 A.L.R.3d 918, § 3 at 928; *see also Kirby* v. *Rosell*, 133 Ariz. 42, 648 P.2d 1048 (1982).

To the same effect see *United States* v. *Castello*, 526 F. Supp. 847 (W.D. Tex. 1981); *Farese* v. *United States*, 428 F.2d 178 (1970); *United States* v. *Howard*, 506 F.2d 865 (1975), citing Holmes, "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado*, 205 U.S. 454, 462 (1907).

Applying those principles to the case at bar leads us to conclude that prejudice cannot be ruled out. The suggestion that some hostility existed between the Larimores on the night preceeding the murder, of the possible use of cocaine by Larimore and his wife's objections, and of his refusal to talk to the police by invoking his rights to counsel and to remain silent could hardly have failed to impact on the jury.

While it is true, as the trial court observed, that these factors did not bear directly on the question of when the homicide occurred, they could well have influenced the jury to decide inversely that appellant was guilty and, therefore, the evidence that the homicide occurred before Larimore left home was more persuasive than the opposing proof.

■ The state submits the appellant failed to demonstrate an abuse of discretion by the trial court in that the defense presented no testimony in support of its motion for a new trial. Ark. R. Evid. 606(b). However, that burden was lifted by the express findings of the trial court that the materials were improperly before the jury and, more important, that the jury did

in fact review the materials. That, we believe, is sufficient in the context of this case.

### III, IV and V

■■ No extended comments are required by appellant's remaining points. His due process argument (III) is rendered moot by our decision to reverse. As to the introduction of photographs and video tape of the victim and crime scene (V), we are not persuaded the trial court's broad discretion was abused. As to the luminol testing (IV), it is not clear what appellant is asking us to review. Appellant's brief states that "most of the luminol evidence was suppressed on chain-of-custody grounds" but that "limited use of luminol" was allowed when there was no confirmatory test, thereby violating *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). The state points out in response that in *Prater* v. *State*, 307 Ark. 180, 820 S.W.2d 429 (1991), this court declined to adopt the *Frye* standard, preferring a more liberal approach in which reliability is the determinant. Whether this issue is likely to recur on remand, we cannot say, but we are reluctant to tie the hands of the trial court on retrial in matters addressed to its discretion. Appellant's brief does not specify what part of the luminol testing was admitted and the record is too voluminous for us to make that determination on our own. Suffice it to say that we have not been shown what portion of the luminol test was admitted or why such admission was erroneous, hence, appellant has failed to demonstrate the error.

For the reasons stated, the judgment appealed from is reversed and the case is remanded for retrial.