STATE of Arkansas *v.* Gregory LARIMORE

CR 99-618                                    17 S.W.3d 87

Supreme Court of Arkansas
Opinion delivered May 25, 2000

*Samuel Turner*, Judge;

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Ass't Att'y Gen., for appellant.

*Daniel G. Ritchey; Bill W. Bristoe;* and *Kent J. Rubens,* for appellee.

R AY THORNTON, Justice. Appellee, Gregory Larimore, was convicted of the first-degree murder of June Larimore, his wife, in 1990 and sentenced to life imprisonment. On May 26, 1992, we reversed the conviction and remanded the case for a new trial because the jury was impermissibly allowed to take excluded evidence into the jury room for deliberation. *Larimore v. State*, 309 Ark. 414, 833 S.W.2d 358 (1992). After retrial in 1993, appellee was again convicted and sentenced to twenty-five years' imprisonment. On May 23, 1994, we affirmed the second conviction. *Larimore v. State*, 317 Ark. 111, 877 S.W.2d 570 (1994). Appellant then filed a petition for postconviction relief under Ark. R. Crim. P. 37, based on allegations of prosecutorial misconduct in failing to disclose exculpatory evidence to the defense. The State moved to dismiss, and appellee amended his petition to assert, in the alternative, that he was entitled to relief through a writ of error *coram nobis*. The trial court dismissed the motion, and appellee appealed to this court from that order of dismissal. On February 10, 1997, we affirmed the motion to dismiss the Rule 37 petition, but determined that the time limits of a Rule 37 petition are not applicable to a writ of error *coram nobis* and granted leave to the circuit court to determine whether a writ of error *coram nobis* should be issued. *Larimore v. State*, 327 Ark. 271, 938 S.W.2d 818 (1997); *see also, Larimore v. State*, 339 Ark. 167, 3 S.W.3d 680 (1999). On March 25, 1999, the Crittenden County Circuit Court granted appellee's writ of error *coram nobis*. The writ set aside appellee's 1993 conviction and ordered a new trial. It is from that order that the State brings this appeal. Because we find no reversible error, we affirm the trial court.

Shortly before noon on January 11, 1990, the body of June Larimore was found on the bedroom floor of her Blytheville home. She had been stabbed in the face, torso, arms, hands, and legs 134 times, apparently with a knife that had been wiped clean and replaced in a cutlery block in the kitchen. The body was nude except for panties rolled down around the hips in a manner which would be consistent with dragging the body by the hands from the bed to the floor. There was a deep stab wound in the pelvic area, but no corresponding cut in the panties. Samples from her vagina did not indicate that a sexual attack had occurred. Body temperature was 91.2 degrees at 12:10 p.m.

When the body was found, a nearby outside door was unlocked, the stereo sound system was still on, her watch and rings were still in place, and her open purse containing cash appeared not to have been disturbed. There was evidence that a violent struggle had occurred in the bedroom, and the bathroom sink appeared to have been wiped off, but the rest of the home appeared to be undisturbed except for the telephones. A telephone in the living room and a cordless phone in the hallway were unplugged, and the cord to a phone in the bedroom was severed. The sheets on the bed were soaked with blood, and some of appellee's clothes were found under the corpse.

Appellee, June Larimore's husband of one year, arrived for work at a family business at about 6:45 a.m. on the day June's body was discovered and worked routinely throughout the morning, showing no signs of stress or emotional upset. When contacted by the Blytheville police, he said that he and June had come home from a wake between nine and ten the previous evening. Appellee told the police that he had fallen asleep on a couch, woke up at 6:00 a.m., and left for work at the family farm supply business at 6:30 a.m. on the morning the body was found. In another statement, he said he awoke around 3:00 a.m. and got into bed with June, where he slept until 6:00 a.m.. Another version was that he woke up at 3:00 a.m., but decided not to disturb June by getting into the bed. He said that when he left home at 6:30 a.m., June was alive and asleep, wearing only a pair of panties. It was undisputed that appellee reported to work at the family business shortly after 6:45 a.m., that he had no blood on him, and that his appearance was normal.

No motive was established for the murder. The State's case was wholly circumstantial, structured on the theory that she was murdered between 2:00 a.m. and 4:00 a.m. and, hence, was not alive when appellee left for work at 6:30 a.m. Thus, the time of death was a crucial element in the case. The State had to establish that the murder took place before appellee went to work. The State attempted to prove this element with the testimony of a forensic pathologist, Dr. Fahmy Malak, the former state medical examiner, who testified that the victim died as early as 1:00 a.m. or 2:00 a.m. on the morning the body was found. Appellee provided expert testimony which contradicted Dr. Malak's opinion of the time of death and suggested that death occurred between 7:00 a.m. and

8:00 a.m. The preliminary state medical report of the time of death had shown the time as 7:00 a.m., but that line had been whited-out and the word "unknown" substituted. Copies of this original document showed the word "unknown" but did not reveal the whited-out alteration. Appellee was found guilty of June Larimore's murder in 1993. We affirmed appellee's conviction in 1994, and civil litigation ensued. During depositions for that litigation, it was discovered that prosecutorial misconduct had occurred. Specifically, it was discovered that the Blytheville Police Department knew that Dr. Malak had first concluded that the time of death was after appellee had left for work and this evidence was not given to the defense.

In 1997, this matter was once again before this court. *See Larimore v. State*, 327 Ark. 271, 938 S.W.2d 818 (1997). In order to test whether a writ of error *coram nobis* must be filed within the time limits applicable to a Rule 37 petition, the State stipulated that material exculpatory evidence had been withheld and that this prosecutorial misconduct was a violation of the due process requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963). The stipulation was conditioned upon the premise that even if the stipulated misconduct had occurred, the petition for relief was untimely; and the stipulation was to be withdrawn if the court decided the petition was not time-barred. On February 10, 1997, we affirmed the dismissal of appellee's Rule 37 petition, but determined that the time limits for a Rule 37 motion are not applicable to a petition for a writ of error *coram nobis*.

We held that due diligence is required in making application for error *coram nobis* relief, and that because appellee's petition for a writ of error *coram nobis* was not untimely, we granted leave to the circuit court to determine whether a writ should be issued. The trial court conducted a thorough and careful review of appellee's petition. At the conclusion of this review, the trial court granted appellee's petition and the State appealed.

The State asserts two points for reversal. Because we consider the State's second point on appeal to be the threshold issue we will address it before determining whether the trial court properly granted appellee's petition for a writ of error *coram nobis*. The State argues that the trial court erred when it found that the concealment of exculpatory evidence constituted a *Brady* violation. As we con-

sider whether the State's withholding of evidence was a *Brady* violation, it is useful to identify the evidence that the State is challenging. Specifically the trial court found the following suppressed evidence:

1. Dr. Fahmy Malak's opinion given to Captain Hill of the Blytheville Police Department on January 12, 1990, that the time of death of June Larimore was "six, six to seven" o'clock.

2. Captain Hill informing Dr. Malak on January 12, 1990, that if the time of death was "six, six to seven" o'clock then appellee had an iron-clad alibi. Specifically, Dr. Malak told Captain Hill that he needed to look at the husband. In response to this advice, Officer Hill told Dr. Malak that appellee had an iron-clad alibi if the time of death was "six, six to seven" o'clock.

3. A taped phone conversation between Chief Christie and Dr. Malak on January 12, 1990, concerning the time of June Larimore's death. Chief Christie of the Blytheville Police Department spoke with Dr. Malak on January 12, 1990, after Dr. Malak had spoken with Captain Hill, and Dr. Malak, without reviewing additional evidence, changed his opinion of June Larimore's time of death to earlier in the morning, before six o'clock. Specifically, the conversation revealed that Chief Christie knew that Dr. Malak had spoken with Captain Hill earlier in the day. When Chief Christie asked Dr. Malak for his opinion of the time of June Larimore's death, he gave an opinion of before six, early in the morning. At the time this opinion was given, Dr. Malak had not seen any photographs or the video of the crime scene.

4. A taped conversation between Chief Christie and Captain Hill on January 12, 1990, prior to the completion of the police investigation of June Larimore's death in which they refer to appellee as "a son of a bitch" and in which Captain Hill states "we've got the son of a bitch."

5. A demand made on January 12, 1990, by the Blytheville Police Department for a warrant for appellee's arrest before the department had completed its investigation. At the time the warrant was requested, Chief Christie and Captain Hill knew that Dr. Malak had given an opinion that June Larimore's time of death was "six, six to seven" o'clock and that after talking with Captain Hill, without reviewing additional evidence, Dr. Malak had changed his opinion. When the prosecutors refused to provide the arrest warrant the police department accused one of the prosecutors of favoritism.

The trial court, after identifying the exculpatory evidence that had been withheld from appellee, explained the ramifications of withholding such evidence. It found that the evidence would have: (1) been beneficial to appellee in framing questions to potential jurors in *voir dire*; (2) provided powerful ammunition to appellee for use during the cross examination of Captain Hill, Chief Christie, and Dr. Malak; (3) been useful in establishing biases of the Blytheville Police Department and Dr. Malak; and (4) provided valuable information for appellee to use during opening statement and closing argument. The trial court concluded that the suppressed evidence was material to the guilt and punishment and that if the evidence had been disclosed, there was a reasonable probability that the result of the proceedings would have been different.

The Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963) held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* In *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, (1999) the Court revisited *Brady* and explained its implications. It noted:

> We have since [the decision in *Brady*] held that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence. Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."

*Strickler, supra. (internal citations omitted)*. The Court, in *Strickler,* also outlined the three elements of a true *Brady* violation. These components include:

> (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.

*Strickler, supra.*

Applying this analysis to the case before us, we hold that the trial court correctly determined that the concealment of the exculpatory evidence constituted a *Brady* violation. First, we note that the evidence concealed was favorable to appellee both because it was exculpatory and because it was impeaching. Specifically, if the withheld evidence had been known to appellee his alibi would have been supported by the State's expert witness and his testimony as to the time of death would have been contradicted. Moreover, the evidence could have been used to impeach Dr. Malak, Captain Hill, and Chief Christie. Additionally, appellee's theory that the police were targeting him as the perpetrator of the crime without properly investigating the murder would have been bolstered. Accordingly, this evidence was favorable to appellee.

Next, we address the question whether exculpatory evidence was suppressed by the State willfully. This evidence was known by the Blytheville Police Department since 1990 and only after two trials was it provided to appellee. We note that at trial, the trial judge, Judge Pearson, had issued a discovery order requiring the State to provide appellee with all evidence relevant to June Larimore's time of death. Although the prosecution may not have been specifically aware of the exculpatory evidence, we have stated that information held by the police is imputed to the prosecution. *Lewis v. State*, 286 Ark. 372, 691 S.W.2d 864 (1985). We conclude that the evidence was willfully suppressed by the State.

Finally, to establish a valid *Brady* claim it must be shown that appellee was prejudiced by the suppression of the evidence. We agree with the trial court's findings that appellee was prejudiced by the withheld exculpatory evidence and that the suppressed evidence would have shown that Dr. Malak's opinion as to the time of death, which had at one time supported appellee's alibi, had been influenced and changed to assist the police and that this was not known at the time of trial by the trial court. We conclude that the trial court's finding that "if said evidence had been disclosed to the defendant, there is a reasonable probability that the results of the proceedings would have been different" is not erroneous, and affirm.

Because the suppression of the evidence by the State meets the elements outlined in *Strickler*, and because the evidence was material to the outcome of the trial, we hold that the trial court correctly found that a *Brady* violation had occurred.

The gravamen of the other point on appeal is that even if a *Brady* violation was shown to exist, that violation did not support the granting of a writ of error *coram nobis*, and a new trial. The State argues that the standards for error *coram nobis* are higher than those which must be met to find a *Brady* violation and that the evidence presented to the trial court did not rise to the level required to grant appellee's petition for the writ and for a new trial.

We recognize that a writ of error *coram nobis* is an extraordinarily rare remedy, more known for its denial than its approval. Literally, *coram nobis* means our court, in our presence, before us. *Penn v. State*, 282 Ark. 571, 670 S.W.2d 426 (1984). The essence of the writ of error *coram nobis* is that it is addressed to the very court that renders the judgment where injustice is alleged to have been done, rather than to an appellate or other court. *Black's Law Dictionary* 337 (6th ed. 1990). The writ is allowed only under compelling circumstances to achieve justice and to address errors of the most fundamental nature. *Pitts v. State*, 336 Ark. 580, 986 S.W.2d 407 (1999). We have held that a writ of error *coram nobis* was available to address certain errors of the most fundamental nature that are found in one of four categories: insanity at the time of trial, a coerced guilty plea, material evidence withheld by the prosecutor, or a third-party confession to the crime during the time between conviction and appeal. *Pitts, supra.*

The trial court has discretion to grant or deny a petition for a writ of error *coram nobis*. *Penn, supra.* The petitioner seeking the writ has a heavy burden to meet. *Id.* On review we determine whether the lower court abused its discretion in granting the writ and a new trial. *State v. Scott*, 289 Ark. 234, 710 S.W.2d 212 (1986). We have outlined the following guidelines for trial courts to consider when determining whether to grant a writ of error *coram nobis*:

> (1) The function of the writ of *coram nobis* is to secure relief from a judgment rendered while there existed some fact which would have prevented its rendition if it had been known to the trial court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment;

(2) *Coram nobis* proceedings are attended by a strong presumption that the judgment of conviction is valid. The court is not required to accept at face value the allegations of the petition;

(3) Due diligence is required in making application for relief, and, in the absence of a valid excuse for delay, the petition will be denied; and

(4) The mere naked allegation that a constitutional right has been invaded will not suffice. The application should make a full disclosure of specific facts [relied] upon and not merely state conclusions as to the nature of such facts.

*Pitts, supra.* If it has merit, by all means a writ of *error coram nobis* should be granted; if the petitioner fails in his burden of proof, then at least a hearing will have resulted. *Penn, supra.*

We note that at different times throughout our jurisprudence we have used different phrases to articulate the standard for determining whether a petition for a writ of *error coram nobis* should be granted. For example, the language of *Pitts, supra*, articulated the very stringent standard that a petition for a writ of error *coram nobis* should be granted when an issue is not addressed at trial because it was somehow hidden or unknown and *would have prevented* the rendition of the judgment had it been known to the trial court. *Id.* For this proposition we cited *Penn, supra,* and *Troglin v. State,* 257 Ark. 644, 519 S.W.2d 740 (1975). The language used in those two cases is not identical. In *Penn,* Justice Hickman explained that a petition for a writ of error *coram nobis* should be accepted only if there is an error of fact extrinsic to the record *"which might have resulted* in a different verdict." *Id.* at 573, 670 S.W.2d at 428.[1] In contrast, according to the language of *Troglin,* as well as *Pitts,* the writ of error *coram nobis* secures relief from a judgment if the error of fact extrinsic to the record *"would have prevented* it rendition." *Troglin* at 645, 519 S.W.2d at 741.[2] We now conclude that both the

---

[1]    We note that *Penn* created an additional situation in which a writ of error *coram nobis* may be proper. In *Penn,* we held that the writ was available in the limited circumstances in which an exculpatory confession is discovered after an individual has been convicted and before he has completed his appeal. *Penn, supra.*

[2]    We note that the "might have resulted" language and the "would have prevented" language were both reflected in *Larimore v. State,* 327 Ark. 271, 938 S.W.2d 818 (1997). The "might have resulted" language was used in *Davis v. State,* 325 Ark. 96, 925 S.W.2d 768 (1996); *Taylor v. State,* 303 Ark. 586, 799 S.W.2d 519 (1990); *Edgemon v. State,* 292 Ark. 465, 730 S.W. 2d 898 (1987); and *Williams v. State,* 289 Ark. 385, 711 S.W. 2d 479 (1986). The

"might have resulted" phrase and the "would have prevented" phrase turn upon the question of whether there was a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the exculpatory evidence been disclosed at trial. We note that the Supreme Court has adopted a similar standard for *Brady* violations in *Strickler*. Specifically, we hold that in our review of the granting of a petition for a writ of error *coram nobis* in this case and all future cases we will determine whether there is a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the exculpatory evidence been disclosed at trial.

In the case before us, the trial court held five days of hearings consisting of numerous witnesses on appellee's petition for a writ of error *coram nobis*, reviewed briefs submitted by the parties, and reviewed the transcripts of appellee's two prior trials and pretrials. In its twelve-page opinion which incorporated by reference a 228 page letter opinion, the trial court found that the prosecution suppressed and withheld favorable evidence from appellee. The trial court found that "the time of death was the sole issue of fact presented by the evidence" and the exculpatory evidence which was withheld related to this issue. The trial court also found that:

> After throughly reviewing all of the old evidence in this case, and the new evidence withheld by the prosecution from the petitioner, the court finds the suppressed evidence to be material to the guilt and punishment and that if the said evidence had been disclosed, there was a reasonable probability that the results of the proceedings would have been different. Also judgment in this case was rendered while there existed facts which would have prevented its rendition if they had been known to the trial court.

Establishing the time of death was the key to the State's case against appellee at trial. The State's theory was that if the murder occurred prior to 6:30 a.m., appellee was the only person who could have committed the crime and used Dr. Malak's opinion as to the time of death to establish this theory. The exculpatory evi-

---

"would have prevented" language was used in *Bell v. State*, 287 Ark. 430, 700 S.W. 2d 788 (1985); *McCarty v. State*, 335 Ark. 445, 983 S.W. 2d 418 (1998); *Brown v. State*, 330 Ark. 627, 955 S.W. 2d 901 (1997); *Mosley v. State*, 333 Ark. 273, 968 S.W. 2d 612 (1998) and *Pacee v. State*, 332 Ark. 184, 962 S.W. 2d 808 (1998).

dence, which had been concealed by the State and was unknown to appellee through no fault or negligence of his own, supported appellee's alibi and contradicted the State's only expert witness. Dr. Malak's original opinion as to the time of death was about the time at which appellee was reporting to work. After Dr. Malak was informed by Captain Hill that appellee had an alibi for that time, Dr. Malak, without reviewing additional evidence, changed his opinion. Because this case involves material exculpatory evidence withheld by the prosecutor, a situation in which we have previously identified as worthy of error *coram nobis* relief, and because there is a reasonable probability that the judgment would not have been rendered if this withheld evidence had been known at the time of entry of the judgment, we conclude that the trial court did not abuse its discretion in granting appellee's petition for a writ of error *coram nobis*, and ordering a new trial, and we affirm the trial court's order.

We note that this decision does not impose restrictions on the use of other expert opinions or presentation of other theories relating to the question of guilt or time of death nor does this decision limit the production of additional evidence that may be useful in the development of the issues that may arise in appellee's new trial.

Affirmed.

GLAZE and SMITH, JJ., dissent.

TOM GLAZE, Justice, dissenting. I respectfully dissent. The majority opinion inappropriately utilizes the ancient, extraordinary writ of error *coram nobis* to allow Gregory Larimore another trial in the stabbing death of June Larimore. First, the writt is inapplicable to the facts in this case, and, second, even if it were, the majority errs by adopting a new liberal standard in granting such writs by stating in "all future cases we will determine whether there is *a reasonable probability* that if the withheld exculpatory evidence had been known at the time of the entry of the judgment, the judgment would not have been rendered."

A writ of error *coram nobis* is used to correct an alleged error of fact not appearing upon the record and is cognizable in the same court in which the cause was originally tried. Arkansas case law is well established that the *writ is not used to contradict or put in issue any*

*fact that has already been adjudicated in the action. See Howard v. State,* 58 Ark. 229, 24 S.W. 8 (1893); *Linton v. State,* 72 Ark. 532, 81 S.W. 608 (1904); *see also* Woods, *The Writ of Coram Nobis in Arkansas,* 8 ARK. L. BUL. 15 (1940).

In *Larimore v. State,* 327 Ark. 271, 938 S.W.2d 818 (1997) (*Larimore III*), we returned this case to the circuit court to determine if a writ should be issued and a new trial granted. The *Larimore III* decision was decided based on Gregory Larimore having learned after the trial in *Larimore v. State,* 317 Ark. 111, 877 S.W.2d 570 (1994) (*Larimore II*), that one of the opinions of the State's witnesses, Dr. Fahmy Malak, was that June's time of death was between 6:00 and 7:00 a.m. Gregory Larimore testified he was at work at 6:45 a.m. the morning June was stabbed to death. Larimore claims if he had known of Malak's 6:00 to 7:00 a.m. opinion, rather than the 1:00 to 2:00 a.m. opinion that Malak adhered to at trial, he could have undermined the State's theory that June was killed at about 1:00 a.m., when Gregory was known to be in the house.

The problem with Larimore's argument is that the time-of-death issue was otherwise litigated extensively in *Larimore II* — so much so that even the defense experts' testimony supported the State's case that Gregory Larimore was at home when June was killed. For example, defense medical expert, Dr. Frank Cleveland, testified that June Larimore's death could have been four and one-half hours to six hours before the rectal temperature was taken from June's body at 12:10 p.m. (the day of the murder), which would put her death between 6:10 a.m. and 7:40 a.m. Defense medical expert, Dr. Werner Spitz, also testified that June's time of death was from four and one-half to five and one-half hours earlier, plus forty minutes for the struggle with her attacker, which would place June's death between 6:00 a.m. and 8:10 a.m. Both Cleveland and Spitz strongly disagreed with Dr. Malak's opinion that June's death occurred between 1:00 and 2:00 a.m.

At trial, the prosecuting attorney argued that Drs. Cleveland's and Spitz's opinions offered a time of death that allowed the jury to find Gregory Larimore was in the house and not at work when June was murdered. It is significant to keep in mind that, while June's *time of death* was placed at times when Gregory Larimore was at home, the struggle and stabbings took place about forty minutes

earlier because it took that much time for her to die. The prosecu-
tor argued to the jurors that, if they found June's death occurred
between the times given by the experts — 12:00 a.m. and 6:00 a.m.
or 6:40 a.m., Gregory Larimore was the person who killed June. In
short, the jury did not have to rely on Dr. Malak's testimony
concerning June's time of death when it had the defense experts'
opinions to rely on.

It is also significant that Larimore's counsel vigorously cross
examined Dr. Malak about his report, which reflected it had been
altered and whited out. Their questioning was directed toward
showing Malak was being less than honest in giving his 1:00 a.m. to
2:00 a.m. opinion when Malak had given an earlier opinion that
June's death occurred between 6:00 and 7:00 a.m. Larimore sug-
gests that, given another chance, he could better cross examine Dr.
Malak regarding Malak's different opinions given on the time-of-
death issue. However, that issue was addressed repeatedly at the
*Larimore II* trial, and the jury had been made well aware of the
shortcomings in Malak's testimony. In addition, considering the
defense medical testimony alone, it justifiably was able to conclude
that Gregory Larimore was in the house when June died.

It is also important to look at the other evidence that shows
Gregory Larimore's guilt, in addition to his presence in the home
when June was murdered. In this respect, this court has held that a
defendant's false or improbable explanation of suspicious circum-
stances may be admissible as proof of guilt. *Stewart v. State*, 338
Ark.608, 999 S.W.2d 684 (1999); *Young v. State*, 316 Ark. 225, 871
S.W.2d 373 (1994). Stated in different terms, the court has held that
a jury may infer a defendant's guilt from improbable explanations of
incriminating conduct. *Byrd v. State*, 337 Ark. 413, 992S.W.2d 759
(1999).

Here, Gregory Larimore gave three different stories, concern-
ing what he did the night before and the morning of June's murder.
One, he told an officer he fell asleep on the couch the night before,
woke up at 6:00 a.m., and went to work at 6:30 a.m. Two, he
explained that he awoke around 3:00 a.m. and got in bed with June,
where he slept until 6:00 a.m. Three, he woke up at 3:00 a.m., but
decided not to get in bed with June. The testimony showed that
June was initially stabbed in her bed and dragged from the bed to
the floor. The perpetrator cleaned the knife used in the stabbings,

returned it to the butcher block in the kitchen, and then wiped and cleaned the bathroom. The State's theory was that Gregory Larimore cleaned his fingerprints from the knife, proceeded to wash himself in the bathroom, cleaned the bathroom, and then went to work.

Also inconsistent with Gregory Larimore's story that he fell asleep on his couch and had not left the house that night or morning was the testimony of a neighbor, Donna Banks, that she heard a loud noise at about 11:00 to 11:30 p.m. the night before June's death. Banks looked out her window and saw the Larimore's porch light come on and go off, but the carport light remained on. She averred that Gregory Larimore's truck was not there. The State submits Larimore lied about his whereabouts during the late hours of the night, and a person could reasonably infer that his absence was reason enough to show a quarrel had arisen between him and June. Furthermore, the State urged at trial that a reasonable inference could be drawn that the viciousness of the stabbing attack on June was committed out of passion, and not by a person merely seeking to burglarize the home or to commit a theft. Moreover, there was no evidence that rape or a sexual crime was a motive in the killing.

Also consistent with the State's theory was testimony given by another neighbor, Daniel Mann, who said he heard a disturbance at the Larimore's house between 2:00 to 4:30 a.m. when the Larimore's dog was barking. Again, the State's case was that something was going on in the Larimore household other than Gregory Larimore being fast asleep on the couch or on June's bed.

Finally, Gregory Larimore's odd reaction to learning about June is a common-sense factor the jury considered. For instance, when Gregory Larimore's sister-in-law called him at work and told him to come home immediately because June was hurt, he first called his mother. And when he got home and was told that his wife was dead, he never asked what happened, even though police cars were all around the place.

Because strong circumstantial evidence exists to show that no one other than Gregory Larimore could have or would have committed June's murder, the jury's decision in finding him guilty was a proper one. Moreover, Gregory Larimore has not shown that a

new trial would do anything but put into issue any facts that have not already been adjudicated. The only real reason on which Larimore seeks a writ calling for a new trial is to question Dr. Malak's credibility and opinion testimony, and Larimore's counsel thoroughly did that in *Larimore II*. At the same time, Larimore's own medical experts' testimony reasonably showed that Larimore was at home when June was murdered, making him the murderer.

The majority opinion also errs by adopting an entirely new standard of review in writ of error *coram nobis* cases. The opinion holds that, in our review of the granting of such writs — *in this case and in future cases* — "we will determine whether there is a *reasonable probability* that if the withheld exculpatory evidence had been known at the time of the entry of the judgment, the judgment would not have been rendered."

First, the majority court ignores the law of the case. This court in *Larimore III* established that the trial court should follow Arkansas's long-settled law when considering whether to grant a writ and instructed the circuit judge to follow the guidelines set forth in *Troglin v. State*, 257 Ark. 644, 519 S.W.2d 740 (1975), which provide in relevant part as follows:

> The function of the writ of error coram nobis is to secure relief from a judgment rendered while there existed some fact which would have prevented its rendition if it had been known to the trial court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment. (Emphasis added.)

In *Larimore III*, the court, citing from *Thompson v. State*, 18 So. 2d 788 (Fla. 1944), further stated that "before a writ of error coram nobis may issue it must appear that the facts alleged as grounds for its issuance are such as *would have precluded the entry of a judgment had they been available at the trial; not that such facts might have produced a different result had they been known to judge and jury*." (Emphasis added.) The majority court commits fundamental error in this case by failing to follow the standard of review set out in *Troglin* and *Larimore III*. In sum, the most that a new trial of this case might produce is a different result. Such a possibility falls short of the proof needed to grant a writ under *Troglin* and *Larimore III*.

In conclusion, it is my view that, even if I could agree with the majority court's decision to adopt the broad and more liberal rule of "reasonable probability,"(which I cannot) the facts here do not permit a new trial. To the contrary, the evidence reflects the reasonable probability that the conviction judgment entered against Gregory Larimore would again be entered, even though Larimore would have an additional statement with which to impeach Dr. Malak's earlier testimony. Larimore's counsel thoroughly impeached Malak's opinion testimony in *Larimore II*, and questioned his honesty and integrity in altering his autopsy report. Once again, the jury had ample medical testimony from the defense's medical experts which the prosecutor argued to the jury and which the jury undoubtedly relied on when it decided June's time of death.

For the reasons above, I believe the trial court erred in granting a new trial.

SMITH, J., joins this dissent.