KAREN R. BAKER, Associate Justice
Petitioner Jessie Buchanan brings this petition to reinvest jurisdiction in the trial court to file a petition for writ of error coram nobis in his criminal case. It is the second such petition filed by Buchanan. The first petition was brought before this court in 2010 and denied. Buchanan v. State , 2010 Ark. 285, 2010 WL 2210923 (per curiam).
In the petition now before us, Buchanan contends that the State violated Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose to the defense a serology report and the victim's death certificate. Because Buchanan's claims do not establish a ground for the writ, the petition is denied. The motion for appointment of counsel is rendered moot by the denial of the petition.
I. Nature of the Writ
The petition for leave to proceed in the trial court is necessary because the trial court can entertain a petition for writ of error coram nobis after a judgment has been affirmed on appeal only after we grant permission. Newman v. State , 2009 Ark. 539, 354 S.W.3d 61. A writ of error coram nobis is an extraordinarily rare remedy. State v. Larimore , 341 Ark. 397, 17 S.W.3d 87 (2000). Coram nobis proceedings are attended by a strong presumption that the judgment of conviction is valid. Green v. State , 2016 Ark. 386, 502 S.W.3d 524. The function of the writ is to secure relief from a judgment rendered while there existed some fact that would have prevented its rendition had it been known to the trial court and which, through no negligence or fault of the defendant, was not brought forward before rendition of the judgment. Newman, supra. The petitioner has the burden of demonstrating a fundamental error of fact extrinsic to the record. Roberts v. State , 2013 Ark. 56, 425 S.W.3d 771.
II. Grounds for the Writ
The writ is allowed only under compelling circumstances to achieve justice *471 and to address errors of the most fundamental nature. Howard v. State , 2012 Ark. 177, 403 S.W.3d 38. A writ of error coram nobis is available for addressing certain errors that are found in one of four categories: (1) insanity at the time of trial, (2) a coerced guilty plea, (3) material evidence withheld by the prosecutor, or (4) a third-party confession to the crime during the time between conviction and appeal. Id.
III. Background
In 1992, a jury found Buchanan guilty of capital murder in the shooting death of Alfred Tobar during an argument at Buchanan's home. Buchanan was sentenced to a term of life imprisonment without parole. We affirmed. Buchanan v. State , 315 Ark. 227, 866 S.W.2d 395 (1993). At his trial, Buchanan testified that he shot at Tobar while in fear for himself, his fiancée, and their two children when Tobar advanced toward him. Evidence was adduced that Tobar was shot five times, twice from the front and three times from the back, with a .22-caliber semiautomatic rifle with a sawed-off stock that required someone to pull the trigger each time a shot was fired. Buchanan testified that he blacked out after the first shot was fired and that he did not intend to kill Tobar. On direct appeal, this court found the jury's decision that Buchanan intended to cause the death of Tobar was supported by the evidence.
IV. Claim of a Brady Violation
To establish a Brady violation, the petitioner must satisfy three elements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; (3) prejudice must have ensued. Howard , 2012 Ark. 177, 403 S.W.3d 38. The mere fact that a petitioner alleges a Brady violation is not sufficient to provide a basis for error coram nobis relief. Wallace v. State , 2018 Ark. 164, 545 S.W.3d 767 ; see also Penn v. State , 282 Ark. 571, 670 S.W.2d 426 (1984) (a mere naked allegation that a constitutional right has been invaded will not suffice to warrant coram nobis relief).
The first Brady violation alleged by Buchanan pertains to a serology report prepared in 1992. The report stated that Tobar's blood type was "O." Buchanan states that in the autopsy report dated one day before the serology report, Tobar's blood type was given as type "AB, Rh Positive." He asserts that the discrepancy indicates that either the crime laboratory or the medical examiner mixed up the blood samples, the samples were contaminated, the samples were lost, or the samples were fabricated. Buchanan argues that the State never proved who had died and that there was no testimony at trial to confirm that it was Tobar who had died. As support for the claims, Buchanan notes that Tobar's death certificate reflects that Tobar's body was disposed of by means of burial on January 16, 1991, which was one year before Tobar was alleged to have been killed by Buchanan on January 10, 1992. Buchanan contends that if he had that information from the original death certificate, which he did not obtain until November 2017, he could have shown at trial that he was actually innocent of killing Tobar.[1] Buchanan did not deny at trial *472 that he killed Tobar, and there was no contention at trial that it was not Tobar who had died. Even if there was an error as to Tobar's blood type and his date of burial, Buchanan has made no showing that the State withheld any exculpatory evidence from the defense in violation of Brady that prejudiced the defense as it was presented at Buchanan's trial.
Considering Buchanan's admission at trial that he shot Tobar, it appears that the crux of his claim of a Brady violation is not that the State withheld evidence that would have created a reasonable probability that the outcome of the trial would have been different--even though he conceded that he had shot the victim--but rather that he perjured himself at trial. That is, he might have asserted a different defense had he known that there was a discrepancy in the reports pertaining to the victim's blood type and the date of his burial. If that is his contention, Buchanan has not met the criteria for issuance of the writ because the allegations in a coram nobis petition must pertain to the trial in which the petitioner was convicted of the offense. Buchanan offered nothing to show that the State concealed any fact from the defense that affected Buchanan's core argument at trial that he acted in self-defense and did not intend to kill Tobar. The fact that Buchanan might have pursued an alternative defense in which he contended that he did not, in fact, kill Tobar had he known of errors in the medical report and the death certificate does not establish that a Brady violation occurred in his trial.
As stated, Buchanan also argues that the State did not present credible scientific evidence at trial that Tobar was actually dead. If it is Buchanan's intention to demonstrate that errors in the documentary evidence and the death certificate rendered the evidence adduced at his trial insufficient to prove that he was guilty, a challenge to the sufficiency of the evidence constitutes a direct attack on the judgment and is not cognizable in a coram nobis proceeding. Grady v. State , 2017 Ark. 245, 525 S.W.3d 1. Allegations that the evidence presented at trial was not sufficient to support a finding of the defendant's guilt are issues to be addressed at trial and, when appropriate, on the record on direct appeal. Jackson v. State , 2017 Ark. 195, 520 S.W.3d 242.
Petition denied; motion moot.

Buchanan's first petition to reinvest jurisdiction in the trial court to consider a coram nobis petition also concerned the scientific evidence adduced at trial. He alleged that the prosecutor violated Brady by deliberately not releasing to the defense the entire medical examiner's file, which Buchanan said he did not receive until March 2009. He further alleged that the state crime laboratory made the medical examiner's file available to the prosecution, including the victim's death certificate and the coroner's report, but never disclosed the file to the defense in the discovery process. He contended that upon examining the death certificate, he had discovered that it lacked the signature of the doctor who performed the postmortem examination and that the coroner's report also was unsigned. He asserted that the death certificate and report were "essential and favorable" and could have been used to impeach the State's witnesses and undermine the testimony of the medical examiner and that no medical examiner, coroner, or qualified physician testified at trial about the cause of the victim's death; nor was there testimony about the coroner's report. He contended that there was a reasonable probability that the outcome of the trial would have been different had the defense been given access to the death certificate and coroner's report, a claim rejected by this court. Buchanan , 2010 Ark. 285.