Joe Louis DANSBY *v.* STATE of Arkansas

CR 97-1415                                           37 S.W.3d 599

Supreme Court of Arkansas
Opinion delivered February 8, 2001

*Appellant,* pro se.

*Mark Pryor,* Att'y Gen., by: *David R. Raupp,* Sr. Ass't Att'y Gen., for appellee.

PER CURIAM. Joe Louis Dansby was found guilty of two counts of capital murder and sentenced to death. We affirmed. *Dansby v. State,* 338 Ark. 697, 1 S.W.3d 403 (1999). After the judgment was affirmed, Dansby filed a petition for post-conviction relief pursuant to Arkansas Rule of Criminal Procedure 37 in the trial court. The petition was denied, and on November 28, 2000, Dansby lodged an appeal of that order here.

On September 14, 2000, Dansby filed the instant petition asking that this court reinvest the trial court with jurisdiction to consider a petition for writ of error *coram nobis* in the case. The petition for leave to proceed in the trial court is necessary because the circuit court can entertain a petition for writ of error *coram nobis* after a judgment has been affirmed on appeal only after we grant permission. A writ of error *coram nobis* is an extraordinarily rare remedy, more known for its denial than its approval. *Larimore v. State,* 341 Ark.397, 17 S.W.3d 87 (2000). Literally, *coram nobis* means our court, in our presence, before us. *Penn v. State,* 282 Ark. 571, 670 S.W.2d 426 (1984). The essence of the writ of error *coram nobis* is that it is addressed to the very court which renders the judgment where injustice is alleged to have been done, rather than to an appellate or other court. *Black's Law Dictionary* 337 (6th ed. 1990). The writ is allowed only under compelling circumstances to achieve justice and to address errors of the most fundamental nature. *Pitts v. State,* 336 Ark. 580, 986 S.W.2d 407 (1999). We have held that a writ of error *coram nobis* was available to address certain errors of the most fundamental nature that are found in one of four categories: insanity at the time of trial, a coerced guilty plea, material evidence withheld by the prosecutor, or a third-party confession to the crime during the time between conviction and appeal. *Pitts, supra.* When determining whether a petitioner is entitled to relief as a result of material evidence withheld by the prosecutor, the petitioner must demonstrate that there is a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the evidence been disclosed at trial. *Larimore, supra.* A mere claim of newly discovered evidence in itself is not a basis for relief under *coram nobis.* *Smith v. State,* 301 Ark. 374, 784 S.W.2d 595 (1990). *Coram nobis* proceedings are attended by a strong presumption that the judgment

of conviction is valid. Due diligence is required in making application for relief. *Penn v. State, supra; Troglin v. State*, 257 Ark. 644, 646, 519 S.W.2d 740, 741 (1975). After reviewing the instant petition, we do not find that petitioner was diligent in advancing the issues raised in this petition or that he has stated any good cause to grant leave to proceed with a petition for writ of error *coram nobis* in the trial court.

Petitioner Dansby contends that he is entitled to error *coram nobis* relief on the ground that two persons, Wayne Mills and Larry Byers, have provided by affidavit exculpatory information that was not available to trial counsel even if counsel had sought the information with due diligence. To place the information contained in the affidavits in context, it is necessary to reiterate some of the circumstances surrounding the murders which are set forth in detail in our decision affirming the judgment.

On May 16, 1992, Malissa Clark and her boyfriend, Jeffrey Lewis, left her residence to go riding on a four-wheel all-terrain vehicle. When Clark's parents learned the next morning that she had not returned home, law enforcement authorities began a search for the couple. By noon that day several pieces of potential evidence had been found, including a pair of pink panties, blood-stained gym shorts, weight-lifting gloves, a part of a gun rack, and several expended .22 shell casings located in a rural area in Nevada County that was designated Crime Scene I. Later that day, the bodies of Clark and Lewis were found several miles away in another rural area that was designated as Crime Scene 2. Both victims had died from multiple gunshot wounds inflicted by a .22 rifle. After petitioner Dansby became a suspect in the homicides, he consented to a search of an area surrounding his home. No shell casings were found in that search, but at a later date four expended .22 shell casings matching those found at Crime Scenes 1 and 2 were found, one on petitioner's back porch and three in his yard. DNA analysis conducted by the F.B.I. and a private testing lab indicated that semen taken from the body of Malissa Clark matched Dansby's DNA. Petitioner's wife and a person incarcerated with petitioner testified that he had admitted committing the offenses.

In his affidavit, Wayne Mills averred that in May 1992 when the homicides occurred he was living on a gravel road, presumably in the area where the victims lived or where their bodies were

found.  At 10:30 a.m. on May 17, 1992, prior to the discovery of the victims, he  saw a pickup truck go down the gravel road with Harley Hillary, identified by petitioner Dansby as the stepfather of Malissa Clark and an investigator for the Nevada County Sheriff's Office, riding in the passenger seat.  Mills saw the truck go back up the road ten minutes later, and soon thereafter he left for work on his bicycle.  Approximately a mile from his house, Mills found a paper bag that he assumed had been thrown from the truck because there was no other traffic on the road and the bag  was dry despite an early morning shower and dew still on the ground.  Inside the paper bag Mills found the following items: a pair of gray jogging shorts, a pair of white panties, several candy bar wrappers, several cigarette butts, pieces of a torn picture of Malissa Clark and Jeff Lewis with a girl Mills did not recognize, a New Testament of the kind distributed by the Gideons, a red diary, and a metal key.  He removed the New Testament, the diary, and the key from the bag and hid them across the road under a tree so that he could examine them later.  At about 5:30 p.m. that day, Mills was headed home when he saw a man he did not recognize with the bag in his hands. He continued home and returned about 6:00 p.m. to the place where he had hidden the New Testament, diary, and key and took the items to his house.  Upon examining the diary, he found that it had been cut open with a knife and several pages removed.  In reading the diary he gathered that it belonged to Malissa Clark and that she had been having sexual relations with Harley Hillary for a number of years.  Mills said that he had since misplaced the diary but would deliver the New Testament and the key to the State Police.  In conclusion, he said that he had not come forward with the information because he feared for his life.  He did not say of whom he was fearful.

Dansby contends that, if Mills is truthful about the contents of the paper bag and correct in his inference that it was discarded by Harley Hillary, a most pernicious act by a State actor occurred on the day the victims' bodies were discovered.  Dansby argues that there is a compelling inference that the paper bag was placed on the road by Hillary, or by an agent at his direction, and that the information about the timing of the event would have been benefi-cial to the defense in its pretrial investigation and would have impeached the State's entire investigation.  He does not contend that the State knew about Mills's finding the paper bag.  His

argument is entirely that the information constitutes newly discovered evidence that was valuable to the defense and could not have been discovered by counsel at the time of trial regardless of counsel's diligence.

In his affidavit, Larry Byers stated that on May 17, 1992, before the victims were found, he went to the home of Harley Hillary to join in the search for the couple. A neighbor came by with a weight-lifting glove that he had found on a logging road that Hillary identified as belonging to Jeff Lewis. The neighbor had also brought a part of a gun rack that Hillary thought had come from Lewis's vehicle. Byers and Hillary drove to the area later designated as Crime Scene 1. (A deputy sheriff was also present when Byers and Hillary were at Crime Scene 1.) There, Byers saw about seven .22 shell casings lying together in a small group. Hillary picked one of the shell casings up and put it back down. Near where the casings were found, the two found a checkbook that Hillary said belonged to Lewis, a pair of sunglasses, and an item of blood-soaked material lying in a bloody spot of grass. Byers said he pointed out that there was a footprint by the bloody grass, but Hillary was "not well focused," and it was Byers's conclusion that Crime Scene 1 was not properly sealed off so that a proper investigation could take place. Byers also saw a pair of women's panties. Byers said that Hillary picked up the bloody item and placed "these items" in a sack and put the sack in his car. The affidavit is not clear on whether the panties and all other items mentioned by Byers as being at Crime Scene 1 were collected by Hillary and placed in the sack. Byers does not state in his affidavit that he has any knowledge that whatever items collected by Hillary at Crime Scene 1 were wrongfully disposed of by Hillary or in some way were concealed from the defense by the State. Byers said that Hillary told him later that he did not need the information about what he had observed at Crime Scene 1. Byers said that he was not asked to give a written statement to investigators and was not called by Dansby's attorneys concerning the case.

Petitioner Dansby alleges that the information Byers had about Crime Scene 1 was withheld from the defense by agents of the State. He contends that testimony at trial and information provided by the State in discovery indicated that fewer shells were found than were described by Byers and in a much different location and configuration than described by Byers. Petitioner asserts that if the

shell casings were indeed found as Byers says they were found, it could be inferred that the perpetrator of the crime had used a pistol rather than a rifle as the State contended and dumped the empty shells on the ground from a cylinder chamber. He further argues that if the murder weapon was not a rifle as the State theorized, the testimony of petitioner's wife regarding her leading investigators to the murder weapon would have been undermined.

██ ██ There is a distinction between fundamental error and newly discovered evidence. Before a writ of error coram nobis may issue it must appear that the facts as alleged as grounds for its issuance are such that there is a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the exculpatory evidence been disclosed at trial, not that the newly discovered evidence *might* have produced a different result had it been known to judge and jury. *Larimore, supra.* The information contained in the affidavits that petitioner contends is newly discovered exculpatory evidence is not of such fundamental nature that it can be said that there is a reasonable probability that the judgment would not have been rendered had the information been brought out at trial, especially in view of the forensic evidence, including DNA testing linking petitioner to one of the victims, and petitioner's admission to two persons of his guilt. With respect to petitioner's claim that the State, or Hillary acting as an agent of the State, may have withheld Byer's account by telling Byers that his information was not needed, petitioner has not demonstrated that there was some deliberate suppression of exculpatory evidence by the State such that a fundamental error extrinsic to the record occurred.

Petition denied.