2012 Ark. 68

**Belynda F. GOFF, Petitioner**

v.

**STATE of Arkansas, Respondent.**

**No. CR 97–135.**

Supreme Court of Arkansas.

Feb. 16, 2012.

Belynda F. Goff, pro se petitioner.

No response.

PER CURIAM.

In 1996, petitioner Belynda F. Goff was found guilty by a jury of first-degree murder in the death of her husband, Stephen Goff. She was sentenced to life imprisonment. On direct appeal, this court found no prejudicial error in the guilt-determination portion of the trial. There was error, however, in the sentencing proceeding, and we reversed and remanded for resentencing. *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997). On remand, petitioner was again sentenced to life imprisonment. We affirmed. *Goff v. State*, 341 Ark. 567, 19 S.W.3d 579 (2000).

Now before us is petitioner's request to reinvest jurisdiction in the trial court to consider a petition for writ of error coram nobis.[1] She also mentions, without further elaboration, that she is entitled to a writ of habeas corpus.

A petition for leave to proceed in the trial court is necessary because the circuit court can entertain a petition for writ of error coram nobis after a judgment has been affirmed on appeal only after we grant permission. *Cox v. State*, 2011 Ark. 96, 2011 WL 737307 (per curiam); *Fudge*

---

1. The petition was filed under the docket number for the direct appeal of the original judgment of conviction, CR 97–135.

v. State, 2010 Ark. 426, 2010 WL 4354240; Grant v. State, 2010 Ark. 286, 365 S.W.3d 894 (per curiam) (citing Newman v. State, 2009 Ark. 539, 354 S.W.3d 61); see also Dansby v. State, 343 Ark. 635, 37 S.W.3d 599 (2001) (per curiam).

■■■ A writ of error coram nobis is an extraordinarily rare remedy, more known for its denial than its approval. Rayford v. State, 2011 Ark. 86, 2011 WL 693584 (per curiam); Whitham v. State, 2011 Ark. 28, 2011 WL 291873 (per curiam); Fudge, 2010 Ark. 426, 2010 WL 4354240; Barker v. State, 2010 Ark. 354, 373 S.W.3d 865; State v. Larimore, 341 Ark. 397, 17 S.W.3d 87 (2000). The writ is allowed only under compelling circumstances to achieve justice and to address errors of the most fundamental nature. Pitts v. State, 336 Ark. 580, 986 S.W.2d 407 (1999) (per curiam). We have held that a writ of error coram nobis was available to address certain errors that are found in one of four categories: insanity at the time of trial, a coerced guilty plea, material evidence withheld by the prosecutor, or a third-party confession to the crime during the time between conviction and appeal. Pitts, 336 Ark. at 583, 986 S.W.2d at 409. The function of the writ is to secure relief from a judgment rendered while there existed some fact that would have prevented its rendition if it had been known to the circuit court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment. Grant, 2010 Ark. 286, 365 S.W.3d 894 (citing Newman, 2009 Ark. 539, 354 S.W.3d 61); see also Sanders v. State, 374 Ark. 70, 285 S.W.3d 630 (2008) (per curiam); Cloird v. State, 357 Ark. 446, 182 S.W.3d 477 (2004). The petitioner has the burden of demonstrating a fundamental error of fact extrinsic to the record. Webb v. State, 2009 Ark. 550, 2009 WL 3681656 (per curiam); Sanders, 374 Ark. 70, 285

S.W.3d 630. Coram-nobis proceedings are attended by a strong ⌊3presumption that the judgment of conviction is valid. Gardner v. State, 2011 Ark. 27, 2011 WL 291972 (per curiam); Barker, 2010 Ark. 354, 373 S.W.3d 865; Echols v. State, 360 Ark. 332, 201 S.W.3d 890 (2005); Penn v. State, 282 Ark. 571, 670 S.W.2d 426 (1984) (citing Troglin v. State, 257 Ark. 644, 519 S.W.2d 740 (1975)).

■■■ As grounds for issuance of the writ, petitioner contends that her defense at the time of trial was not made aware of three documents that she has recently discovered. The documents are a report by a police dispatcher, Debra Price; a report by a police officer, Jim Resterholz; and the radio log for the early morning of June 12, 1994, compiled by the Carroll County Sheriff's Department. To understand the alleged significance of the documents, it is necessary to summarize that part of the record concerning the morning that the victim was found dead.

The record reflects that petitioner and her husband had had marital problems for some time prior to his death. Petitioner believed that her husband had affairs with at least two women. A friend of petitioner testified that petitioner had said about one year before Stephen Goff was killed that petitioner would "bash his head in" the next time that he was unfaithful. At the time of his death, petitioner testified that she was suspicious of her husband's behavior.

On the evening of June 11, 1994, petitioner, Stephen Goff, and their three-year-old son were at home in their apartment. Several hours before Goff was killed, he left the couple's apartment for a pack of cigarettes. Petitioner testified that, after her husband left, she went to bed and heard no unusual noises during the night. An upstairs neighbor, however, testified that at around 2 a.m. on June 12, she

heard three knocks on petitioner's door and the sound of the door opening. One to two minutes later, the neighbor heard five or six loud "bangings," as if someone were banging a broomstick against the ceiling. The doctor who performed the autopsy on Goff testified that the condition of his body was consistent with his having been beaten to death around 2 a.m. on June 12.

Petitioner testified that she slept through the night, with the exception of hearing a door shut at some time during the night, until awakened by her alarm at about 4:30 a.m. When she arose, she found her husband's body and called the emergency number, which was answered by Mark Forsee, an emergency medical technician at the Carroll Regional Medical Center. Forsee testified that he remained on the telephone with petitioner for nine minutes while the ambulance was en route to the apartment. In the conversation, petitioner told Forsee that there was blood everywhere and that it was her husband's. While she repeatedly declined Forsee's suggestion to turn on the lights in the room, she did not exhibit any concern or fear that the police might be needed or that an intruder might still be in the apartment. Jay Thomas, the first paramedic on the scene, testified that he could only open the door to the apartment about six inches because Goff's body was lying against the front door, which was the only door to the apartment. Petitioner and her son were only able to leave the apartment after the door was forced opened about eight inches. The police officer who investigated the scene testified that there was massive blood loss from the victim and pieces of his skull were found around the room. There was no sign of forced entry to the door and no signs of a struggle. Police officers found blood consistent with Stephen Goff's DNA in the bathtub drain. The bathtub, shower curtain, toilet plunger, and a sponge were wet. In addition, four extremely wet towels and a washcloth and ten damp towels were found in the master bedroom under a pile of dry, dirty clothes.

The doctor who performed the autopsy on the victim testified that Goff died of at least six blunt-force injuries to the head. The shape of the wounds was consistent with an object, such as a hammer, with an oval striking surface. Two hammers were found in the kitchen of the apartment. A forensic consultant testified that the wounds were inflicted by a right-handed person. Proof showed that petitioner is right-handed.

Petitioner reported her husband's death to his insurance company, claiming that he was severely beaten somewhere in Carroll County, returned to the apartment, and left in the doorway. The forensic evidence, however, clearly indicated that Goff was killed inside the front door of the apartment. This court found on appeal that the evidence was more than sufficient to establish that petitioner killed her husband.

■■ Petitioner argues as grounds for a writ of error coram nobis that the State violated the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding the three documents from the defense. Allegations of a *Brady* violation fall within one of the categories of error that this court has recognized. *Pinder v. State*, 2011 Ark. 401, 2011 WL 4492362 (per curiam). The fact that a petitioner alleges a *Brady* violation, however, is not in itself sufficient to provide a basis for error-coram-nobis relief. *Burks v. State*, 2011 Ark. 173, 2011 WL 1522524 (per curiam). Assuming that the withheld evidence meets the requirements of a *Brady* violation and is both material and prejudicial, in order to justify issuance of the writ, the withheld material evidence must also be such as to have

prevented rendition of the judgment had it been known at the time of trial. *Id.* To merit relief, a petitioner must demonstrate that there is a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the information been disclosed at trial. *Id.*

Petitioner asserts that the significance of the three documents is that the documents show that there was proof that, while she slept, someone entered the apartment, murdered Goff, and left. The report by the dispatcher Price reflects that at 4:29 a.m. on the morning Goff was killed, a female caller, who said that she was a nurse at the "Carroll General Hospital," called the dispatcher, said that a "beating death" had occurred, and provided the address of the Goff apartment. Petitioner contends that the fact that someone besides petitioner knew of the death, including the cause of the death, and reported it indicates that someone besides petitioner must have committed the crime. She further claims that the police-radio log from that morning reveals that someone reported "his or her own crime," i.e., the murder of Goff, or association with the crime, before the first officer arrived at the scene. She asserts that the call from the woman who said she was a nurse was deliberately hidden from the defense to bolster the State's claim that petitioner alone committed the murder. She argues that, if the defense had had the documents, the woman who made the call could have been linked by the defense to "unsavory looking characters" who were seen at the apartment complex with a baseball bat in their vehicle just hours before the murder. Petitioner alleges that the police report at issue reflects that the door to the apartment was not made impassable by the victim's body, as alleged by the State, because two officers entered and exited through the door, and at least five persons

knew that the door was not blocked. She essentially argues that, if Goff's body was not blocking the door after he was killed, the unobstructed exit through the door supports her claim that another person or persons killed Goff. She contends that, if the police report had been available, her defense would have been able to call those five persons to testify that the door was passable. Considering the three documents, we do not find that petitioner has demonstrated that a writ of error coram nobis should issue on the claims presented in her petition. One of petitioner's attorneys at trial avers in an affidavit appended to the petition that, to the best of his knowledge, the report by Officer Resterholz and the incident report by Debra Price were not provided to the defense and were not in the prosecutor's file. Nevertheless, even if counsel does not recall seeing the documents, the significance of the documents must be weighed against the totality of the evidence to determine if the documents at issue would have been such as to have prevented rendition of the judgment had the existence of those documents been known at the time of trial. *Sanders v. State*, 2011 Ark. 199, 2011 WL 1687837 (per curiam).

The document written by Price reported that a telephone call was received at 4:29 a.m. on June 12, 1994, from a woman who identified herself as a nurse at Carroll General Hospital. The woman informed Price that a "beating death" had occurred at the address of the Goff apartment. We cannot say that the jury's knowledge of this call would have prevented rendition of the judgment, inasmuch as a telephone-company operator testified at trial that petitioner called "0" at about 4:22 a.m. on June 12, 1994, seeking emergency help for her husband. The operator dialed the ambulance service and connected petitioner to it. Mark Forsee, the paramedic

who answered the call at 4:18 or 4:19, according to his clock at the medical center, testified that he received a call from a woman requesting an ambulance for her husband. Forsee remained on the line with the woman, identified as petitioner, who said that her husband was covered in blood and not moving. Given the fact that persons at the medical center were aware, by virtue of petitioner's call to the medical center, that Goff was badly injured, it is likely that one of the nurses there called the police. Petitioner contends that the "nurse" was never identified despite a search for her, but petitioner offers no substantiation for the claim that there was an extensive investigation in an attempt to locate the woman. This court is not required to accept the allegations in a petition for writ of error coram nobis at face value. *Scott v. State,* 2009 |₈Ark. 437, 2009 WL 3047239 (per curiam). We consider the cumulative effect of the allegedly suppressed evidence to determine whether the evidence that was alleged to have been suppressed was material to the guilt or punishment of the individual. *Sanders,* 2011 Ark. 199, 2011 WL 1687837; *Williams v. State,* 2011 Ark. 151, 2011 WL 1320159 (per curiam); *see also Thrash v. State,* 2011 Ark. 118, 2011 WL 913211 (per curiam). Clearly, the mere fact that the telephone call was made to police by an unidentified woman reporting the death at about the time that petitioner called for an ambulance does not negate the abundance of evidence that demonstrated that petitioner was the only adult in the apartment at the time of her husband's death.

With respect to petitioner's claim that the documents at issue proved that the apartment door was not impassable, i.e., that her husband's body was not against it, when the paramedics first arrived, there was testimony at trial that was consistent with Officer Resterholz's report. Resterholz said in the report that paramedic Jay Thomas "squeezed through the cracked door." Thomas testified at trial that the apartment was dark when he arrived. He knocked and pushed the door slightly but stopped after he felt resistance. He was told by petitioner not to "smash" her husband who was behind the door. He further testified that he had to push the door about six inches to get it open sufficiently to get his head inside and see Goff's body and that he and an officer had to push the door further to help Goff and her son "squeeze through." Without identifying the person, petitioner alleges that an investigator testified that the door was passable. Rather, there was testimony from an investigator who arrived after Officer Resterholz that the door could only be opened one foot because of resistance. Also, Mark Forsee testified that petitioner herself told him on the telephone that she could not open the door for the ambulance crew. Petitioner has not shown that there is a reasonable probability that the outcome of the |₉trial would have been different had any of the documents at issue been available to the defense on the question of whether the door was blocked by the victim's body.

 Finally, with respect to petitioner's conclusory claim that she is entitled to a writ of habeas corpus, a writ of habeas corpus is only proper when a judgment of conviction is invalid on its face or when a circuit court lacked jurisdiction over the cause. *Abernathy v. Norris,* 2011 Ark. 335, 2011 WL 3930360 (per curiam); *Davis v. Reed,* 316 Ark. 575, 873 S.W.2d 524 (1994). The burden is on the petitioner in a habeas-corpus petition to establish that the trial court lacked jurisdiction or that the commitment was invalid on its face; otherwise, there is no basis for a finding that a writ of habeas corpus should issue. *Young v. Norris,* 365 Ark. 219, 226 S.W.3d 797 (2006) (per curiam). The peti-

tioner must plead either the facial invalidity or the lack of jurisdiction and make a "showing by affidavit or other evidence [of] probable cause to believe" that he or she is illegally detained. *Id.* at 221, 226 S.W.3d at 798–99. Petitioner here does not allege that the trial court lacked jurisdiction or that the commitment was invalid on its face, and there is no ground stated in the petition that calls into question the jurisdiction of the court or the facial validity of the commitment.

Petition denied.