Gary CLORID *v.* STATE of Arkansas

CR 03-597                                    182 S.W.3d 477

Supreme Court of Arkansas
Opinion delivered May 20, 2004

*Jeff Rosenzweig*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brent P. Gasper*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Gary Cloird filed a petition for writ of error *coram nobis* in the Jefferson County Circuit Court, asserting the State had withheld exculpatory DNA test results from his defense attorney in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The circuit court found the test results were not favorable to the defense, and denied Mr. Cloird's petition. On appeal, Mr. Cloird argues the circuit court erred in its findings and in its denial of his petition. We affirm.

Gary Cloird, Roosevelt Burton, and Kurt Morris were tried in August 1992 for the kidnapping and rape of a woman, and Mr. Cloird was also charged with theft of a van that occurred on the same evening. We affirmed Mr. Cloird's convictions for rape, for which he was sentenced to thirty years' imprisonment, and the theft of a van, for which he was sentenced to five years' imprisonment and a $1000 fine, with the sentences to run consecutively with each other and any sentence he was then serving. *See Cloird v. State*, 314 Ark. 296, 862 S.W.2d 211 (1993). In 2002, this court granted by per curiam opinion Mr. Cloird's petition to reinvest jurisdiction in the Jefferson County Circuit Court to consider a petition for writ of error *coram nobis*. *See Cloird v. State*, 349 Ark. 33, 76 S.W.3d 813 (2002). The petition alleged a possible *Brady* violation, in that DNA results were allegedly received by the prosecuting attorney prior to trial and not turned over to Mr. Cloird's counsel, though the results showed his DNA was not found in samples taken from the rape victim.

In granting Mr. Cloird's petition to reinvest jurisdiction in the circuit court, we directed the circuit court to make five findings in order to determine whether a *Brady* violation occurred:

(1) whether the DNA test results were available to the State before trial; (2) whether the DNA evidence, if available to the State before trial, was favorable to the defense; (3) whether prejudice ensued to the defense as a result of the State's failure to disclose the DNA results; (4) whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; and (5) whether Mr. Cloird proceeded with due diligence in making his application for relief.

The circuit court held a hearing on the above issues on December 5, 2002, in which it heard testimony from Mr. Cloird, defense counsel for one of his codefendants, the deputy prosecuting attorney who prosecuted Mr. Cloird's case, and others. At the conclusion of the evidence, the circuit court made the following findings: (1) the DNA test results were available to the State before trial; (2) the DNA evidence was neither favorable nor harmful to the defense; (3) the DNA evidence *was* furnished to defense counsel prior to trial; (4) even if the test results had been withheld, they were not determinative of any point at issue in the trial and the result of the trial would not have been different by use of the DNA results; and (5) Mr. Cloird proceeded with due diligence in his attempts to obtain the results of the DNA tests in a timely manner.

Pursuant to these findings, the circuit court denied the petition for writ of error *coram nobis*. The circuit court's first and fifth findings are not challenged on appeal. Mr. Cloird challenges the circuit court's remaining findings as being in error. This appeal follows an appeal already decided by this court; therefore, jurisdiction is proper pursuant to Ark. S. Ct. R. 1-2(a)(7).

■ The standard of review of the denial of petition for writ of error *coram nobis* is whether the trial court abused its discretion in granting or denying the writ. *Magby v. State*, 348 Ark. 415, 72 S.W.3d 508 (2002) (citing *State v. Larimore*, 341 Ark. 397, 17 S.W.3d 87 (2000)). An abuse of discretion occurs when the circuit court acts arbitrarily or groundlessly. *Isom v. State*, No. CR02-213, slip op. (Feb. 19, 2004). The trial court's findings of fact, on which it bases its decision to grant or deny the petition for writ of error *coram nobis*, will not be reversed on appeal unless they are clearly erroneous or clearly against the preponderance of the evidence. *Green v. State*, 343 Ark. 244, 33 S.W.3d 485 (2000).

In *State v. Larimore*, 341 Ark. 397, 17 S.W.3d 87 (2000), we explained the guidelines for trial courts when determining whether to grant a petition for writ of error *coram nobis*:

(1) The function of the writ of *coram nobis* is to secure relief from a judgment rendered while there existed some fact which would have prevented its rendition if it had been known to the trial court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment;

(2) *Coram nobis* proceedings are attended by a strong presumption that the judgment of conviction is valid. The court is not required to accept at face value the allegations of the petition;

(3) Due diligence is required in making application for relief, and, in the absence of a valid excuse for delay, the petition will be denied; and

(4) The mere naked allegation that a constitutional right has been invaded will not suffice. The application should make a full disclosure of specific facts relied upon and not merely state conclusions as to the nature of such facts.

*Id.* at 406–07, 17 S.W.3d at 93 (citing *Pitts v. State*, 336 Ark. 580, 986 S.W.2d 407 (1999)). The petitioner seeking the writ has a heavy burden to meet. *State v. Larimore, supra.* If a petition for error *coram nobis* has merit, by all means the petition should be granted; and if the petitioner fails in his burden of proof, then at least a hearing will have resulted. *Id.* (citing *Penn v. State*, 282 Ark. 571, 670 S.W.2d 426 (1984)). Additionally, we held that, in our review of the granting of a petition for a writ of error *coram nobis* based on an alleged *Brady* violation, we will determine whether there is a reasonable probability that the judgment of conviction would not have been rendered or would have been prevented, had the exculpatory evidence been disclosed at trial. *State v. Larimore, supra.*

In *State v. Larimore*, the trial court granted the petition for writ of error *coram nobis*, because the State had withheld exculpatory information from the defense on the issue of the time of death of the murder victim. Specifically, the medical examiner's report had been altered to "white-out" the original time of death, and replace it with a time of death when the accused was known to have been home with the victim. This change was made after the

medical examiner had discussed the time of death with investigating police officers, and with no further examination of the evidence by the medical examiner. While the original of the report clearly showed the time of death had been altered, the photocopy given to the defense did not look as though it had been altered. The State stipulated that the medical examiner's original report, and the information about the altered time of death, had been concealed by the prosecution — specifically, by the police and the medical examiner. We affirmed the trial court's finding that the exculpatory evidence supported the defendant's alibi and contradicted the State's only expert witness; thus, we determined that the trial court had not abused its discretion in granting the petition for writ of error *coram nobis*.

In the instant case, Mr. Cloird has likewise alleged that the State committed a *Brady* violation in that it withheld exculpatory DNA test results from Mr. Cloird's defense attorney. Unlike *Larimore*, though, the State has not stipulated that it withheld the DNA results from Mr. Cloird's attorney; in fact, the State asserts that Mr. Cloird's attorney was provided the results. Because this issue is dispositive to our holding in this case, we must review the elements of a *Brady* violation.

■■ In *Brady v. Maryland*, the defense had requested the prosecution turn over all statements made by Brady's accomplice, and the prosecution had turned over all the accomplice's statements except the one in which the accomplice admitted committing the actual murder. *See Brady v. Maryland, supra.* In affirming the Maryland Court of Appeals' decision to remand for retrial on the question of punishment, the U.S. Supreme Court held, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196-97. In the more recent case of *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court outlined the components of a *Brady* violation:

> [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence — that is, to any suppression of so-called "*Brady* material" — although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a

different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. at 281-82, 119 S.Ct. at 1948.

■ It is notable that in both *Brady v. Maryland, supra,* and *Strickler v. Greene, supra,* as well as our own decision in *State v. Larimore, supra,* there was no question that the defense was not provided the material at issue, though the State knew of its existence prior to trial. Thus, when determining whether a *Brady* violation has occurred, it must first be determined that the material was available to the State prior to trial and the defense did not have it. Having determined these threshold matters, it is then necessary to go to the three-pronged test for a *Brady* violation, as laid out in *Strickler v. Greene, supra*; that is, the trial court must determine (1) whether the material was favorable to the accused, (2) if favorable, whether it was deliberately or inadvertently withheld by the State, and (3) if withheld, whether prejudice ensued from the suppression of the material.

■ In the instant case, there was no absolute proof one way or the other about whether or not the defense had the DNA results, because Mr. Cloird's attorney, Robert Remet, died several years ago and all his client files were destroyed. However, the circuit court did find that the DNA results were available to the State prior to trial and, as stated earlier, that finding is not challenged on appeal. Therefore, we go to the circuit court's second finding, in which it determined the DNA results were neither favorable nor unfavorable to the defense.

Mr. Cloird contends the DNA results completely exonerated him, because his DNA was not a match to the semen and hair samples taken from the rape victim. The victim's testimony at trial described Mr. Cloird's part in her assault and was abstracted as follows:

> I cannot tell you how many times Kurt Morris had sexual contact with me. It was more than once. Common sense would tell me that it wasn't more than ten times. *Gary Cloird had sexual contact with me several times. He had sexual contact with me in the second bedroom* . . . In the second bedroom, I cannot tell you who all was present

because the door opened and shut several times. *I know that this man had sexual contact with me because Kurt got him. He told him to come on and it was his turn. He did not identify him by name.* [Abs. at 79.]

. . . .

Mr. Cloird had nothing to do with the blue car.[1] In the second bedroom, *he grabbed me by the top of my head, my hair and pulled me down like that. He pulled me down on his penis.* This bedroom was at the house trailer in Humphrey. *The first time that it happened it was just him. The second time, I cannot tell you. I am saying it happened twice.* It was dark in this bedroom. I had listened to their voices, and there was some light from the hallway. It wasn't a lot of lighting. It wasn't impossible to tell who was there, because I had listened to their voices. The first time Kurt told him to come on I was standing at the door to the second bedroom. Kurt was standing close to me. I can't tell you exactly how close.

The victim's testimony was consistent that the "sexual contact" she suffered from Mr. Cloird took place in what she referred to as "the second bedroom" because it was the second of three bedrooms in which she was assaulted. She had already described being vaginally and anally raped by Kurt Morris and Roosevelt Burton in the first bedroom. The victim's testimony about Mr. Cloird's assault described an act of oral rape, in which Mr. Cloird grabbed the victim by the top of her head and forced her down upon his penis. She described this as happening twice, and Mr. Cloird's argument in his post-hearing brief was consistent with her testimony, when he stated, "[t]he alleged victim claimed that Cloird had sex with her twice."

At the hearing on the petition, Mr. Cloird's counsel argued before the circuit court:

So that's — that's her testimony with regard — that's her specific testimony with regard to Mr. Cloird. She is specifically alleging *sexual activity* between herself and Mr. Cloird. He is not — he is not alleged to have been a mere bystander, accomplice, holding her

---

[1] This was asked, because Kurt Morris and Roosevelt Burton, the other two co-defendants, originally kidnapped the victim in a blue car. Gary Cloird was not with them in the car. The first time the victim saw Gary Cloird was at the mobile home where Morris and Burton drove the victim after kidnapping her.

down or otherwise not positioned *to deposit biological evidence within her*. She is alleging *actual physical — physical contact*. The [DNA] evidence is clearly exculpatory, clearly impeaching of her. Clearly exculpatory of Mr. Cloird. And clearly matters that he would have been entitled that would and should have been used if available at a trial. And so I would ask that the State's motion to dismiss at this time be denied.

(Emphasis added.) Contrary to Mr. Cloird's assertion that the DNA results would have exonerated him or impeached the victim, the testimony presented by the victim at trial was that Mr. Cloird had *orally* raped her twice, and the evidence at the hearing was that samples taken from the victim for DNA testing were *vaginal*, not oral, swabs. Thus, the circuit court found the DNA results were neither favorable nor unfavorable to Mr. Cloird and were, therefore, not material. The circuit court's findings on this point are found in its order:

> According to evidence produced, the DNA test results excluded defendant Cloird as a contributor of the specimens tested. Thus, it would appear that such evidence would be favorable to his defense.
>
> However, the Plaintiff/respondent points out that the DNA test results related only to <u>vaginal</u> swabs taken from the [victim]. An examination of the relevant pages of the trial record reveals that the testimony of the victim indicated that the only sexual contact between the victim and the defendant was <u>oral</u>. Plaintiff/respondent points out that this was established by cross-examination of the victim by trial counsel.
>
> Plaintiff/respondent further submits that trial counsel elicited testimony from the investigating police officer that there was "no physical evidence tying Cloird to the offense." The State concedes this but correctly points out that any test run on vaginal swabs would not be determinative of any oral contact between the victim and the defendant. The State further correctly submits that, contrary to an exoneration of petitioner, the DNA test results would not have been determinative of anything.
>
> The Court thus concludes and finds that the DNA evidence was not favorable to the defense. It was not harmful to the defense. It was simply not a factor.

(Emphasis in original.)

The circuit court's finding of fact on this issue is well-reasoned and takes into account the evidence presented at the hearing. Therefore, we cannot say that the court was clearly erroneous in finding that the DNA results were neither favorable nor detrimental to Mr. Cloird's defense. As a *Brady* violation occurs only when evidence favorable to the defense is suppressed by the prosecution, there can be no *Brady* violation in this case where the circuit court found the DNA results were not favorable to the defense, and there is no need to address the circuit court's remaining findings. Accordingly, we hold the circuit court did not abuse its discretion in denying Mr. Cloird's petition for writ of error *coram nobis*.

Affirmed.

DICKEY, C.J., not participating.